# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 27, 2010         Decided March 26, 2010

No. 08-5223

SPEECHNOW.ORG, ET AL.,
APPELLANTS

v.

FEDERAL ELECTION COMMISSION,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-00248-JR)

———

No. 09-5342

DAVID KEATING, ET AL.,
APPELLANTS

v.

FEDERAL ELECTION COMMISSION,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-00248-JR)

———

*Steven M. Simpson* argued the cause for appellants. With him on the brief were *William H. Mellor*, *Robert W. Gall*, *Robert P. Frommer*, *Paul M. Sherman*, and *Stephen M. Hoersting*.

*Heidi K. Abegg* and *Alan P. Dye* were on the briefs for *amici curiae* Alliance for Justice, et al. in support of appellants.

*David B. Kolker*, Associate General Counsel, Federal Election Commission, argued the cause for appellee. With him on the briefs was *Vivien Clair*, Attorney.

*Joseph G. Hebert*, *Donald J. Simon*, *Scott L. Nelson*, *Fred Wertheimer* were on the briefs for *amici curiae* Campaign Legal Center and Democracy 21.

*Howard R. Rubin* was on the briefs for *amici curiae* The Brennan Center for Justice and Professor Richard Briffault in support of appellee.

Before: SENTELLE, *Chief Judge*, GINSBURG, HENDERSON, ROGERS, TATEL, GARLAND, BROWN, GRIFFITH, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

SENTELLE, *Chief Judge*: David Keating is president of an unincorporated nonprofit association, SpeechNow.org

(SpeechNow), that intends to engage in express advocacy[1] supporting candidates for federal office who share his views on First Amendment rights of free speech and freedom to assemble. In January 2008, the Federal Election Committee (FEC) issued a draft advisory opinion concluding that under the Federal Election Campaign Act (FECA), SpeechNow would be required to organize as a "political committee" as defined by 2 U.S.C. § 431(4) and would be subject to all the requirements and restrictions concomitant with that designation. Keating and four other individuals availed themselves of 2 U.S.C. § 437h, under which an individual may seek declaratory judgment to construe the constitutionality of any provision of FECA. As required by that provision, the district court certified the constitutional questions directly to this court for en banc determination. Thereafter, the Supreme Court decided *Citizens United v. FEC*, 130 S. Ct. 876 (2010), which resolves this appeal. In accordance with that decision, we hold that the contribution limits of 2 U.S.C. § 441a(a)(1)(C) and 441a(a)(3) are unconstitutional as applied to individuals' contributions to SpeechNow. However, we also hold that the reporting requirements of 2 U.S.C. §§ 432, 433, and 434(a) and the organizational requirements of 2 U.S.C. § 431(4) and 431(8) can constitutionally be applied to SpeechNow. In this action the district court also denied the plaintiffs' motion to enjoin FEC enforcement of FECA's contribution limits against SpeechNow. Because we hold that those provisions cannot be constitutionally applied, we vacate

---

[1]"Express advocacy" is regulated more strictly by the FEC than so-called "issue ads" or other political advocacy that is not related to a specific campaign. In order to preserve the FEC's regulations from invalidation for being too vague, the Supreme Court has defined express advocacy as "communications containing express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'" *Buckley v. Valeo*, 424 U.S. 1, 44 n.52 (1976).

the order denying that injunction and remand the matter to the district court for further proceedings consistent with our decision.

## I. Background

SpeechNow is an unincorporated nonprofit association registered as a "political organization" under § 527 of the Internal Revenue Code. Its purpose is to promote the First Amendment rights of free speech and freedom to assemble by expressly advocating for federal candidates whom it views as supporting those rights and against those whom it sees as insufficiently committed to those rights. It intends to acquire funds solely through donations by individuals. SpeechNow further intends to operate exclusively through "independent expenditures." FECA defines "independent expenditures" as expenditures "expressly advocating the election or defeat of a clearly identified candidate" that are "not made in concert or cooperation with or at the request or suggestion of such candidate, the candidate's authorized political committee, or their agents, or a political party committee or its agents." 2 U.S.C. § 431(17). SpeechNow has five members, two of whom are plaintiffs in this case: David Keating, who is also SpeechNow's president and treasurer, and Edward Crane. Keating makes the operational decisions for SpeechNow, including in which election campaigns to run advertisements, which candidates to support or oppose, and all administrative decisions.

Though it has not yet begun operations, SpeechNow has made plans both for fundraising and for making independent expenditures. All five of the individual plaintiffs – Keating, Crane, Fred Young, Brad Russo, and Scott Burkhardt – are prepared to donate to SpeechNow. Keating proposes to donate $5500. Crane proposes to donate $6000. Young, who is

otherwise unaffiliated with SpeechNow, proposes to donate $110,000. Russo and Burkhardt want to make donations of $100 each. In addition, as of August 2008, seventy-five other individuals had indicated on SpeechNow's website that they were interested in making donations. As for expenditures, SpeechNow planned ads for the 2008 election cycle against two incumbent candidates for federal office who, in the opinion of SpeechNow, did not sufficiently support First Amendment rights. These ads would have cost around $12,000 to produce. Keating intended to place the ads so that the target audience would view the ads at least ten times, which would have cost around $400,000. As SpeechNow never accepted any donations, it never produced or ran these ads. However, SpeechNow intends to run similar ads for the 2010 election cycle if it is not subject to the contribution limits of § 441a(a) at issue in this case.

On November 19, 2007, SpeechNow filed with the FEC a request for an advisory opinion, asking whether it must register as a political committee and if donations to SpeechNow qualify as "contributions" limited by § 441a(a)(1)(C) and 441a(a)(3). At the time, the FEC did not have enough commissioners to issue an opinion, but it did issue a draft advisory opinion stating that SpeechNow would be a political committee and contributions to it would be subject to the political committee contribution limits. Believing that subjecting SpeechNow to all the restrictions imposed on political committees would be unconstitutional, SpeechNow and the five individual plaintiffs filed a complaint in the district court requesting declaratory relief against the FEC under 2 U.S.C. § 437h. Because § 437h allows only the FEC, political parties, or individuals the right to bring such actions, this court removed SpeechNow from the § 437h proceedings. SpeechNow remains in the caption for this case because it, along with the individual plaintiffs, also sought a preliminary injunction

prohibiting the FEC from enforcing the political committee contribution limits with respect to contributions to SpeechNow, and the denial of that injunction is also on appeal before this court. Because this court was already scheduled to hear the constitutional issues en banc, we consolidated the appeal with the en banc proceeding.

Section 437h provides that a "district court immediately shall certify all questions of constitutionality of this Act [FECA] to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc." The district court made findings of fact, and certified to this court five questions:

> 1. Whether the contribution limits contained in 2 U.S.C. §§ 441a(a)(1)(C) and 441a(a)(3) violate the First Amendment by preventing David Keating, SpeechNow.org's president and treasurer, from accepting contributions to SpeechNow.org in excess of the limits contained in §§ 441a(a)(1)(C) and 441a(a)(3).

> 2. Whether the contribution limit mandated by 2 U.S.C. § 441a(a)(1)(C) violates the First Amendment by preventing the individual plaintiffs from making contributions to SpeechNow.org in excess of $5000 per calendar year.

> 3. Whether the biennial aggregate contribution limit mandated by 2 U.S.C. § 441a(a)(3) violates the First Amendment by preventing Fred Young from making contributions to SpeechNow.org that would exceed his individual biennial aggregate limit.

> 4. Whether the organizational, administrative, and continuous reporting requirements set forth in 2 U.S.C. §§ 432, 433, and 434(a) violate the First Amendment by

requiring David Keating, SpeechNow.org's president and treasurer, to register SpeechNow.org as a political committee, to adopt the organizational structure of a political committee, and to comply with the continuous reporting requirements that apply to political committees.

5. Whether 2 U.S.C. §§ 431(4) and 431(8) violate the First Amendment by requiring David Keating, SpeechNow.org's president and treasurer, to register SpeechNow.org as a political committee and comply with the organizational and continuous reporting requirements for political committees before SpeechNow.org has made any expenditures or broadcast any advertisements.

*SpeechNow.org v. FEC*, No. 08-0248 (D.D.C. Sept. 28, 2009).

Under FECA, a political committee is "any committee, club, association, or other group of persons" that receives contributions of more than $1000 in a year or makes expenditures of more than $1000 in a year. 2 U.S.C. § 431(4). Once a group is so designated, contributions to the committee are restricted by 2 U.S.C. § 441a(a)(1)(C) and 441a(a)(3). The first provision limits an individual's contribution to a political committee to $5000 per calendar year; the second limits an individual's total contributions to all political committees to $69,900 biennially.[2] *See* Price Index Increases for Contribution

---

[2]Subject to exceptions not here relevant, FECA defines "contributions" as "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(8)(A)(i). Again subject to exceptions, the Act defines "expenditure" as "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of

and Expenditure Limitations, 74 Fed. Reg. 7437 (Feb. 17, 2009) (increasing § 441a(a)(3)(B)'s limit from $57,500 to $69,900). A political committee also must comply with all applicable recordkeeping and reporting requirements of 2 U.S.C. §§ 432, 433, and 434(a). Under those sections, if the FEC regulates SpeechNow as a political committee, SpeechNow would be required to, among other things: appoint a treasurer, § 432(a); maintain a separately designated bank account, § 432(b), 432(h); keep records for three years that include the name and address of any person who makes a contribution in excess of $50, § 432(c)(1)-(2), 432(d); keep records for three years that include the date, amount, and purpose of any disbursement and the name and address of the recipient, § 432(c)(5), 432(d); register with the FEC within ten days of becoming a political committee, § 433(a); file with the FEC quarterly or monthly reports during the calendar year of a general election detailing cash on hand, total contributions, the identification of each person who contributes an annual aggregate amount of more than $200, independent expenditures, donations to other political committees, any other disbursements, and any outstanding debts or obligations, § 434(a)(4), 434(b); file a pre-election report and a post-election report detailing the same, *id.*; file semiannual or monthly reports with the same information during years without a general election, *id.*; and file a written statement in order to terminate the committee, § 433(d).

## II. Analysis

A. *Contribution Limits (Certified Questions 1-3)*

The First Amendment mandates that "Congress shall make no law . . . abridging the freedom of speech." In *Buckley v.*

---

influencing any election for Federal office; and [ ] a written contract, promise, or agreement to make an expenditure." 2 U.S.C. § 431(9)(A)(i)-(ii).

*Valeo*, 424 U.S. 1 (1976), the Supreme Court held that, although contribution limits do encroach upon First Amendment interests, they do not encroach upon First Amendment interests to as great a degree as expenditure limits. In *Buckley*, the Supreme Court first delineated the differing treatments afforded contribution and expenditure limits. In that case, the Court struck down limits on an individual's expenditures for political advocacy, but upheld limits on contributions to political candidates and campaigns. In making the distinction, the Court emphasized that in "contrast with a limitation upon expenditures for political expression, a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication." *Id.* at 20-21. However, contribution limits still do implicate fundamental First Amendment interests. *Id.* at 23.

When the government attempts to regulate the financing of political campaigns and express advocacy through contribution limits, therefore, it must have a countervailing interest that outweighs the limit's burden on the exercise of First Amendment rights. Thus a "contribution limit involving significant interference with associational rights must be closely drawn to serve a sufficiently important interest." *Davis v. FEC*, 128 S. Ct. 2759, 2772 n.7 (2008) (quoting *McConnell v. FEC*, 540 U.S. 93, 136 (2003)) (internal quotation marks omitted). The Supreme Court has recognized only one interest sufficiently important to outweigh the First Amendment interests implicated by contributions for political speech: preventing corruption or the appearance of corruption. *Id.* at 2773; *FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 496-97 (1985) ("*NCPAC*"). The Court has rejected each of the few other interests the government has, at one point or another, suggested as a justification for contribution or expenditure limits. Equalization of differing viewpoints is not a legitimate

government objective. *Davis*, 128 S. Ct. at 2773. An informational interest in "identifying the sources of support for and opposition to" a political position or candidate is not enough to justify the First Amendment burden. *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 298 (1981). And, though this rationale would not affect an unincorporated association such as SpeechNow, the Court has also refused to find a sufficiently compelling governmental interest in preventing "the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form." *Citizens United v. FEC*, 130 S. Ct. 876, 902, 905 (2010) (quoting *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 660 (1990), and rejecting *Austin*'s and subsequent cases' reliance on that interest).

Given this precedent, the only interest we may evaluate to determine whether the government can justify contribution limits as applied to SpeechNow is the government's anti-corruption interest. Because of the Supreme Court's recent decision in *Citizens United v. FEC*, the analysis is straightforward. There, the Court held that the government has *no* anti-corruption interest in limiting independent expenditures.[3]

*Citizens United* involved a nonprofit corporation that in January 2008 produced a film that was highly critical of then-Senator Hillary Clinton, a candidate in the Democratic Party's 2008 Presidential primary elections. The film was, "in essence, . . . a feature-length negative advertisement that urges viewers to vote against Senator Clinton for President." *Citizens United*, 130 S. Ct. at 890. As such, the film was subject to the restrictions of 2 U.S.C. § 441b. That provision made it unlawful for any corporation or union to use general treasury funds to

---

[3] Of course, the government still has an interest in preventing *quid pro quo* corruption. However, after *Citizens United*, independent expenditures do not implicate that interest.

make independent expenditures as defined by 2 U.S.C. § 431(17) or expenditures for speech defined as "electioneering communications," which are certain types of political ads aired shortly before an election or primary, 2 U.S.C. § 434(f)(3). The Supreme Court declared this expenditure ban unconstitutional, holding that corporations may not be prohibited from spending money for express political advocacy when those expenditures are independent from candidates and uncoordinated with their campaigns. 130 S. Ct. at 913.

The independence of independent expenditures was a central consideration in the Court's decision. By definition, independent expenditures are "not made in concert or cooperation with or at the request or suggestion of such candidate, the candidate's authorized political committee, or their agents, or a political party committee or its agents." 2 U.S.C. § 431(17). As the *Buckley* Court explained when it struck down a limit on independent expenditures, "[t]he absence of prearrangement and coordination of an expenditure with the candidate or his agent . . . alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate." *Citizens United*, 130 S. Ct. at 908 (quoting *Buckley*, 424 U.S. at 47). However, the *Buckley* Court left open the possibility that the future might bring data linking independent expenditures to corruption or the appearance of corruption. The Court merely concluded that independent expenditures "do[] not presently appear to pose dangers of real or apparent corruption comparable to those identified with large campaign contributions." 424 U.S. at 46.

Over the next several decades, Congress and the Court gave little further guidance respecting *Buckley*'s reasoning that a lack of coordination diminishes the possibility of corruption. Just a few months after *Buckley*, Congress codified a ban on corporations' independent expenditures at 2 U.S.C. § 441b. In

1978, in *First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978), the Court "struck down a state-law prohibition on corporate independent expenditures related to referenda," but did not "address the constitutionality of the State's ban on corporate independent expenditures to support candidates." *Citizens United*, 130 S. Ct. at 902, 903. Though the *Bellotti* Court sweepingly rejected "the proposition that speech that otherwise would be within the protection of the First Amendment loses that protection simply because its source is a corporation," 435 U.S. at 784, it limited the implications of that rejection by opining in a footnote that "Congress might well be able to demonstrate the existence of a danger of real or apparent corruption in independent expenditures by corporations to influence candidate elections," 435 U.S. at 788 n.26. Then, in *Austin*, the Court expressly upheld a Michigan law that prohibited corporate independent expenditures. 494 U.S. at 654-55. And in *McConnell*, the Court relied on *Austin* to uphold the Bipartisan Campaign Reform Act of 2002's (BCRA's) extension of § 441b's ban on corporate expenditures to electioneering communications. 540 U.S. at 203-09.

The *Citizens United* Court reevaluated this line of cases and found them to be incompatible with *Buckley*'s original reasoning. The Court overruled *Austin* and the part of *McConnell* that upheld BCRA's amendments to § 441b. More important for this case, the Court did so by expressly deciding the question left open by the footnoted caveat in *Bellotti*. The Court stated, "[W]e now conclude that independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption." *Citizens United*, 130 S. Ct. at 909.

The Court came to this conclusion by looking to the definition of corruption and the appearance of corruption. For several decades after *Buckley*, the Court's analysis of the

government's anti-corruption interest revolved largely around the "hallmark of corruption," "financial *quid pro quo*: dollars for political favors," *NCPAC*, 470 U.S. at 497. However, in a series of cases culminating in *McConnell*, the Court expanded the definition to include "the appearance of undue influence" created by large donations given for the purpose of "buying access," 540 U.S. at 144, 148. *See also FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 441 (2001); *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 389 (2000). The *McConnell* Court concluded that limiting the government's anti-corruption interest to preventing *quid pro quo* was a "crabbed view of corruption, and particularly of the appearance of corruption" that "ignores precedent, common sense, and the realities of political fundraising." 540 U.S. at 152. The *Citizens United* Court retracted this view of the government's interest, saying that "[t]he fact that speakers may have influence over or access to elected officials does not mean that these officials are corrupt." 130 S. Ct. at 910. The Court returned to its older definition of corruption that focused on *quid pro quo*, saying that "[i]ngratiation and access . . . are not corruption." *Id.* Therefore, without any evidence that independent expenditures "lead to, or create the appearance of, *quid pro quo* corruption," and only "scant evidence" that they even ingratiate, *id.*, the Court concluded that independent expenditures do not corrupt or create the appearance of corruption.

In its briefs in this case, the FEC relied heavily on *McConnell*, arguing that independent expenditures by groups like SpeechNow benefit candidates and that those candidates are accordingly grateful to the groups and to their donors. The FEC's argument was that large contributions to independent expenditure groups "lead to preferential access for donors and undue influence over officeholders." Appellee's Br. in *Keating v. FEC*, at 16. Whatever the merits of those arguments before *Citizens United*, they plainly have no merit after *Citizens United*.

In light of the Court's holding as a matter of law that independent expenditures do not corrupt or create the appearance of *quid pro quo* corruption, contributions to groups that make only independent expenditures also cannot corrupt or create the appearance of corruption. The Court has effectively held that there is no corrupting "quid" for which a candidate might in exchange offer a corrupt "quo."

Given this analysis from *Citizens United*, we must conclude that the government has no anti-corruption interest in limiting contributions to an independent expenditure group such as SpeechNow. This simplifies the task of weighing the First Amendment interests implicated by contributions to SpeechNow against the government's interest in limiting such contributions. As we have observed in other contexts, "something . . . outweighs nothing every time." *Nat'l Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989). Thus, we do not need to quantify to what extent contributions to SpeechNow are an expression of core political speech. We do not need to answer whether giving money is speech per se, or if contributions are merely symbolic expressions of general support, or if it matters in this case that just one person, David Keating, decides what the group will say. All that matters is that the First Amendment cannot be encroached upon for naught.

At oral argument, the FEC insisted that *Citizens United* does not disrupt *Buckley*'s longstanding decision upholding contribution limits. This is literally true. But, as *Citizens United* emphasized, the limits upheld in *Buckley* were limits on contributions made *directly to candidates*. Limits on direct contributions to candidates, "unlike limits on independent expenditures, have been an accepted means to prevent *quid pro quo* corruption." *Citizens United*, 130 S. Ct. at 909 (citing *McConnell*, 540 U.S. at 136-38 & n.40).

The FEC also argues that we must look to the discussion about the potential for independent expenditures to corrupt in *Colorado Republican Federal Campaign Committee v. FEC*, 518 U.S. 604 (1996). This, too, is unavailing. In *Colorado Republican*, the Court considered the constitutionality of FECA provisions that exempted political party committees from the general political committee contribution limits, but imposed limitations on political party committees' independent expenditures. *Id.* at 611-13. A majority of the Court agreed that the independent expenditure limitations were unconstitutional, but no more than three Justices joined any single opinion. It is true that the opinion of Justice Breyer did discuss the potential for corruption or the appearance of corruption potentially arising from independent expenditures, saying that "[t]he greatest danger of corruption . . . appears to be from the ability of donors to give sums up to $20,000 to a party which may be used for independent party expenditures for the benefit of a particular candidate," thus evading the limits on direct contributions to candidates. *Id.* at 617 (opinion of Breyer, J.). But *Colorado Republican* concerned expenditures by political parties, which are wholly distinct from "independent expenditures" as defined by 2 U.S.C. § 431(17). Moreover, a discussion in a 1996 opinion joined by only three Justices cannot control our analysis when the more recent opinion of the Court in *Citizens United* clearly states as a matter of law that independent expenditures do not pose a danger of corruption or the appearance of corruption.

The FEC argues that the analysis of *Citizens United* does not apply because that case involved an expenditure limit while this case involves a contribution limit. [Oral Tr. at 30, 31.] Alluding to the divide between expenditure limits and contribution limits established by *Buckley*, the FEC insists that contribution limits are subject to a lower standard of review than expenditure limits, so that "what may be insufficient to justify

an expenditure limit may be sufficient to justify a contribution limit." Oral Arg. Tr. at 39. Plaintiffs, on the other hand, argue that *Citizens United* stands for the proposition that "burdensome laws trigger strict scrutiny." Oral Arg. Tr. at 58. We do not find it necessary to decide whether the logic of *Citizens United* has any effect on the standard of review generally afforded contribution limits. The *Citizens United* Court avoided "reconsider[ing] whether contribution limits should be subjected to rigorous First Amendment scrutiny," 130 S. Ct. at 909, and so do we. Instead, we return to what we have said before: because *Citizens United* holds that independent expenditures do not corrupt or give the appearance of corruption as a matter of law, then the government can have no anti-corruption interest in limiting contributions to independent expenditure–only organizations. No matter which standard of review governs contribution limits, the limits on contributions to SpeechNow cannot stand.

We therefore answer in the affirmative each of the first three questions certified to this Court. The contribution limits of 2 U.S.C. § 441a(a)(1)(C) and 441a(a)(3) violate the First Amendment by preventing plaintiffs from donating to SpeechNow in excess of the limits and by prohibiting SpeechNow from accepting donations in excess of the limits. We should be clear, however, that we only decide these questions as applied to contributions to SpeechNow, an independent expenditure–only group. Our holding does not affect, for example, § 441a(a)(3)'s limits on direct contributions to candidates.

B. *Organizational and Reporting Requirements (Certified Questions 4 & 5)*

Disclosure requirements also burden First Amendment interests because "compelled disclosure, in itself, can seriously

infringe on privacy of association and belief." *Buckley*, 424 U.S. at 64. However, in contrast with limiting a person's ability to spend money on political speech, disclosure requirements "impose no ceiling on campaign-related activities," *id.*, and "do not prevent anyone from speaking," *McConnell*, 540 U.S. at 201 (internal quotation marks and alteration omitted). Because disclosure requirements inhibit speech less than do contribution and expenditure limits, the Supreme Court has not limited the government's acceptable interests to anti-corruption alone. Instead, the government may point to any "sufficiently important" governmental interest that bears a "substantial relation" to the disclosure requirement. *Citizens United*, 130 S. Ct. at 914 (quoting *Buckley*, 424 U.S. at 64, 66, and citing *McConnell*, 540 U.S. at 231-32). Indeed, the Court has approvingly noted that "disclosure is a less restrictive alternative to more comprehensive regulations of speech." *Citizens United*, 130 S. Ct. at 915 (citing *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 262 (1986)).

The Supreme Court has consistently upheld organizational and reporting requirements against facial challenges. In *Buckley*, the Court upheld FECA's disclosure requirements, including the requirements of §§ 432, 433, and 434(a) at issue here, based on a governmental interest in "provid[ing] the electorate with information" about the sources of political campaign funds, not just the interest in deterring corruption and enforcing anti-corruption measures. 424 U.S. at 66. In *McConnell*, the Court upheld similar requirements for organizations engaging in electioneering communications for the same reasons. 540 U.S. at 196. *Citizens United* upheld disclaimer and disclosure requirements for electioneering communications as applied to Citizens United, again citing the government's interest in providing the electorate with information. 130 S. Ct. at 913-14. And while the Court in *Davis v. FEC* found that a certain disclosure requirement

violated the First Amendment, it only did so because that disclosure triggered the application of an unconstitutional provision which imposed asymmetrical contribution limits on candidates based on how much of their personal funds they planned to spend. Because the asymmetrical limits were unconstitutional, there was no justification for the disclosure requirement. 128 S. Ct. at 2775.

Plaintiffs do not disagree that the government may constitutionally impose reporting requirements, and SpeechNow intends to comply with the disclosure requirements that would apply even if it were not a political committee. *See* 2 U.S.C. § 434(c) (reporting requirements for individuals or groups that are not political committees that make independent expenditures); § 441d (disclaimer requirements for independent expenditures and electioneering communications). Instead, plaintiffs argue that the additional burden that would be imposed on SpeechNow if it were required to comply with the organizational and reporting requirements applicable to political committees is too much for the First Amendment to bear. We disagree.

SpeechNow, as we have said, intends to comply with the disclosure requirements applicable to those who make independent expenditures but are not organized as political committees. Those disclosure requirements include, for example, reporting much of the same data on contributors that is required of political committees, 2 U.S.C. § 434(c); information about each independent expenditure, such as which candidate the expenditure supports or opposes, *id.*; reporting within 24 hours expenditures of $1000 or more made in the twenty days before an election, § 434(g)(1); and reporting within 48 hours any expenditures or contracts for expenditures of $10,000 or more made at any other time, § 434(g)(2).

Because SpeechNow intends only to make independent expenditures, the additional reporting requirements that the FEC would impose on SpeechNow if it were a political committee are minimal. Indeed, at oral argument, plaintiffs conceded that "the reporting is not really going to impose an additional burden" on SpeechNow. Oral Arg. Tr. at 14 ("Judge Sentelle: So, just calling you a [PAC] and not making you do anything except the reporting is not really going to impose an additional burden on you right? . . . Mr. Simpson: I think that's true. Yes."). Nor do the organizational requirements that SpeechNow protests, such as designating a treasurer and retaining records, impose much of an additional burden upon SpeechNow, especially given the relative simplicity with which SpeechNow intends to operate.

Neither can SpeechNow claim to be burdened by the requirement to organize as a political committee as soon as it receives $1000, as required by the definition of "political committee," 2 U.S.C. § 431(4), 431(8), rather than waiting until it expends $1000. Plaintiffs argue that such a requirement forces SpeechNow to comply with the burdens of political committees without knowing if it is going to have enough money to make its independent expenditures. This is a specious interpretation of the facts before us. As the district court found, SpeechNow already has $121,700 in planned contributions from plaintiffs alone, with dozens more individuals claiming to want to donate. SpeechNow can hardly compare itself to "ad hoc groups that want to create themselves on the spur of the moment," as plaintiffs attempted at oral argument. Oral Arg. Tr. at 17. In addition, plaintiffs concede that in practice the burden is substantially the same to *any* group whether the FEC imposes reporting requirements at the point of the money's receipt or at the point of its expenditure. Oral Arg. Tr. at 15-16. A group raising money for political speech will, we presume, always hope to raise enough to make it worthwhile to spend it. Therefore, groups would need to collect and keep the necessary

data on contributions even before an expenditure is made; it makes little difference to the burden of compliance *when* the group must comply as long as it anticipates complying at some point.

We cannot hold that the organizational and reporting requirements are unconstitutional. If SpeechNow were not a political committee, it would not have to report contributions made exclusively for administrative expenses. *See* 2 U.S.C. § 434(c)(2)(C) (requiring only the reporting of contributions "made for the purpose of furthering an independent expenditure"). But the public has an interest in knowing who is speaking about a candidate and who is funding that speech, no matter whether the contributions were made towards administrative expenses or independent expenditures. Further, requiring disclosure of such information deters and helps expose violations of other campaign finance restrictions, such as those barring contributions from foreign corporations or individuals. These are sufficiently important governmental interests to justify requiring SpeechNow to organize and report to the FEC as a political committee.

We therefore answer the last two certified questions in the negative. The FEC may constitutionally require SpeechNow to comply with 2 U.S.C. §§ 432, 433, and 434(a), and it may require SpeechNow to start complying with those requirements as soon as it becomes a political committee under the current definition of § 431(4).

## Conclusion

We conclude that the contribution limits set forth in certified questions 1, 2, and 3 cannot be constitutionally applied against SpeechNow and the individual plaintiffs. We further conclude that there is no constitutional infirmity in the

application of the organizational, administrative, and reporting requirements set forth in certified questions 4 and 5. We further conclude that because of our decision today, as guided by *Citizens United*, which intervened since the entry of the district court's denial of plaintiffs' petition for injunctive relief, the district court's order denying injunctive relief is vacated and remanded for further proceedings consistent with our decision.

*So ordered*.